712 P.2d 445

**PEARCE DEVELOPMENT,**
Petitioner Employer,

**Mission Insurance Co.,**
Petitioner Carrier,

v.

The **INDUSTRIAL COMMISSION OF
ARIZONA,** Respondent,

**Rhonda McHardy,** Respondent
Employee,

**Pearce & Sons,** Respondent Employer,

**Industrial Indemnity,**
Respondent Carrier,

**Pearce & Sons,** Respondent Employer,

**Western Fire Ins. Co.,**
Respondent Carrier.

No. 1 CA–IC 3266.

Court of Appeals of Arizona,
Division 1, Department B.

June 18, 1985.

John F. Day, P.C., Phoenix, for petitioners.

Sandra A. Day, Chief Counsel, Indus. Com'n of Arizona, Phoenix, for respondent.

Charles M. Wilmer, Phoenix, for respondent employee.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.C. by Donald Cross, Larry Smith, and Lisa M. Sommer, Phoenix, for respondent carrier Indus. Indem.

Lewis and Roca by R. Kent Klein, Merton E. Marks, R. Todd Lundmark, Phoenix, for respondent carrier Western Fire Ins.

## OPINION

OGG, Judge.

This is a special action review of a consolidated Industrial Commission award reopening an April 15, 1981 claim and denying compensability of a July 6, 1983 gradual injury claim. At issue is the interpreta-

tion of recent successive injury cases and the application of the successive injury doctrine to a case involving a degenerative condition aggravated by all weight-bearing activity, including the employee's normal work.

## I. FACTS

The employer is common to both claims. It is therefore both a petitioner and a respondent. The petitioner carrier (Mission) was at risk during 1981. One respondent carrier, Western Fire Insurance Co. (Western), was at risk during 1982. The other respondent carrier, Industrial Indemnity, was at risk during 1983.

On April 15, 1981, the respondent employee (claimant) twisted her left knee at work. She was then thirty years old. Before this injury, she had no knee problems. After it, she had swelling, tenderness and instability.

Mission accepted the claim for the left knee injury. Treating orthopedic surgeon Samuel S. Kaplan, M.D., suspected an "internal derangement" (Physician's Initial Report), but an April 27, 1981 arthrogram was normal. He restricted the claimant's activity and her symptoms appeared to resolve. Dr. Kaplan then discharged her to return to regular work. Mission subsequently closed the claim without permanent impairment effective May 19, 1981.

The claimant's regular work was physical. She had to lift cases and kegs of beer, deliver them using a hand-truck, and stock shelves, which required bending and kneeling. The claimant's job changed in the summer of 1981, but the physical demands were similar.

After the claimant returned to work, her knee once again became symptomatic. Initially, the fluid buildup and discomfort were intermittent and exercises Dr. Kaplan had prescribed afforded relief. As she continued working, her symptoms gradually became more frequent and the exercises less effective. In November and December 1982, when the claimant's workload increased during the holiday season, the symptoms worsened.

By January 1983, the claimant decided she had to see Dr. Kaplan again. He was unavailable until February 4, 1983. After this examination, Dr. Kaplan recommended surgery. At the claimant's request, this was scheduled for May, 1983. The claimant continued working until April 11, 1983, when the knee pain finally disabled her. Surgery was then rescheduled and performed on April 30, 1983.

The claimant petitioned to reopen her April 15, 1981 claim, alleging that her "knee has never been exactly right. Exercises Dr. Kaplan prescribed helped. But little by little my knee became more of a problem." Mission denied the petition. The claimant requested a hearing and she also filed a new gradual injury claim. This was supported by Dr. Kaplan's June 27, 1983 opinion letter stating that the claimant's "work activity, particularly within the last six to eight months, is a contributing factor to the present medical condition of her left knee." Industrial Indemnity denied compensability. Western was then joined as a party, and it too denied compensability. The claimant protested these denials and the reopening and new injury claims were consolidated for hearing and disposition.

At the scheduled hearings, the claimant confirmed this history of gradual worsening. She denied suffering any specific injury after returning to work.

Two medical experts appeared: Dr. Kaplan and Gerald C. Moczynski, M.D., an independent consultant. Dr. Kaplan testified that his April, 1983 surgery revealed multiple loose bodies of long-standing origin and a minor meniscus tear of recent origin. He diagnosed a chondral fracture, a very unusual condition for a person the claimant's age. This loose body abraded the cartilage, loosening additional bodies. As these accumulated, the abrasion increased. This degeneration culminated in the claimant's increased symptoms at the end of 1982. The April 15, 1981 industrial injury probably caused the chondral fracture. After this, all weight-bearing activity had a degenerative effect. In Dr. Kaplan's opinion,

the claimant's work, especially the heavy lifting requiring bending of the knees, *accelerated the rate of degeneration,* just as increased pressure on sandpaper intensifies its abrasiveness.

Dr. Moczynski agreed that the April 15, 1981 industrial injury caused a chondral fracture and that this condition led to the degeneration. He confirmed that activity, including the claimant's work, would aggravate the degeneration. He conceded that the claimant's increased activity during late 1982 could have precipitated the increased symptoms, but testified that it is equally possible that the degeneration had simply progressed to the symptomatic stage. Finally, in Dr. Moczynski's opinion, the degenerative changes "may very well have occurred over that period of time independent of any work activity."

The administrative law judge then issued the award granting reopening of the first claim and denying compensability on the second. He summarized Dr. Kaplan's testimony as follows:

> Although eventually applicant could have come to the condition that she was in early in 1983, even without any working activity, Dr. Kaplan felt that the heavier the activity, such as the applicant's employment activities, the more aggravating and injurious the subsequent activities would have been. However, *his testimony does not establish that if the loose body had not already been there as a result of the 1981 injury that any subsequent working activity at any time would have produced the condition which he found early in 1983.* (Emphasis added.)

He summarized Dr. Moczynski's testimony as follows:

> He stated that any activity, including gradual erosion without working activities, could bring the applicant to the condition that she was in by early 1983, but he also testified that the later working activity was in the nature of an aggravation, *but would not have made her any worse if the 1981 injury had not been present.* (Emphasis added.)

Then, after rejecting the applicability of *Professional Furniture Service v. Industrial Commission,* 133 Ariz. 206, 650 P.2d 508 (App.1982), the administrative law judge relied on *Dutton v. Industrial Commission,* 140 Ariz. 448, 682 P.2d 453 (App. 1984), and *O'Donnell v. Industrial Commission,* 125 Ariz. 358, 609 P.2d 1058 (App. 1980), to conclude that:

> the loose body attributable to the 1981 injury and eventually causing the lost time and medical care and surgery thereafter requires the reopening of applicant's 1981 claim file for benefits as provided by law. *The evidence and applicable legal principles do not establish that the applicant's condition should be considered to be in the nature of a new injury or injuries occurring while she was working in 1982 and 1983 for the defendant employer when it was insured by different insurance carriers.* (Emphasis added.)

The award was affirmed on administrative review and this special action followed.

## II.  ANALYSIS

On review, Mission argues that *Professional Furniture Service* is consistent with prior authority and controls the present case. It also argues that *Dutton* and *O'Donnell* are either distinguishable or inconsistent with prior authority. In contrast, Industrial Indemnity and Western distinguish *Professional Furniture Service* and rely on *Dutton* and *O'Donnell* to support the award.

### A.  Precedents

*Professional Furniture Service, supra,* is a standard successive injury case. The employee injured his right knee at work. This claim was ultimately closed with a scheduled disability. The employee returned to work for his former employer, which had changed compensation carriers. After working for nine months to a year without any substantial problems, the employee then reinjured the right knee when he slipped on an oil spill. The medical evidence established that the first injury

created a condition that the second acted upon to cause the current condition. This court set aside a reopening of the original injury claim and imposed full responsibility on the carrier at risk when the second injury occurred:

> [W]hen two industrial claims are involved, such [medical] testimony is not sufficient to impose liability on the first injury carrier. Rather, in such circumstances, our courts have refused to apply the doctrine of consequential damages so as to hold the first carrier liable, and instead have imposed liability on the second carrier.... As stated in *Morrison-Knudsen [Company, Inc., v. Industrial Commission,* 115 Ariz. 492, 566 P.2d 293 (1977)]:
>
> > "Although the second injury would have been less severe in the absence of the prior injury, the second employer is held to be solely responsible."
>
> *This is merely a specialized application of the principle that an employer takes an employee as he finds him, and if an injury operates upon an existing condition or disability and produces a further injurious result, then that result is held to have been caused by the injury.* (Emphasis added—citations omitted)

*Id.* 133 Ariz. at 209, 650 P.2d at 511.

*O'Donnell, supra,* in contrast is an unusual successive injury case. The employee, a cement mason, injured his right knee at work. This claim was ultimately closed with a scheduled disability. The employee returned to his trade but for different employers. His knee impairment, however, prevented kneeling; this forced him to work in a constantly stooped position. After working this way for several years, he developed a new back condition.

The employee petitioned to reopen the first injury claim but did not file any new injury claims. The administrative law judge denied reopening because the industrially-related stooping was a superseding cause of the new injury. This court set aside the award, holding that reopening applies if the new condition is a "direct and natural result" of the primary injury and

the employee's voluntary conduct contributing to the new injury is reasonable in light of his knowledge of his previous condition. *Id.* 125 Ariz. at 360–61, 609 P.2d at 1060–61. But this holding did not exclude a new injury claim:

> Also, from what we have stated so far, it is apparent that where the subsequent activity giving rise to a subsequent injury or aggravation related to the primary injury is work related, the claimant may well have two avenues open to him—a reopening of the primary injury *or* a new claim based upon the work-related activity. Many factors may weigh in the choice of which avenue to trod, including the proof associated with reasonable conduct on reopening, the proof necessary, especially in gradual injury cases, for a new claim, the timeliness of a new claim, and in an inflationary period, the incentive of an increase in average monthly wage usually associated with the last employment. Be that as it may, *the initial choice of how a claimant wishes to proceed, by seeking a reopening, by seeking a new injury status, or both, is primarily the responsibility of the claimant, not the hearing officer. And although the hearing officer may conclude that the facts before him would justify a new claim injury being filed, this alone does not authorize him to deny compensability for a reopening and thus substitute his judgment as to the appropriate remedy for that of the claimant.*
>
> We hasten to add at this point that under the circumstances presented in this case, the successful reopening claimant may well preclude himself from additional relief. As stated in *Scott v. L.E. Dixon Co.* [42 Ariz. 525, 27 P.2d 1109 (1934)]: "The employee cannot have his cake and eat it too." He very well may be entitled to compensation benefits, but he is not entitled to dual carrier responsibility for the same present physical condition. (Emphasis added—citation omitted.)

*Id.* at 362, 609 P.2d at 1062.

The last of this trio is *Dutton, supra.* The employee herniated a disk at work.

The responsible compensation carrier rehabilitated him for self-employment as a locksmith. In July 1981, the claim was closed with a permanent impairment but without disability because of the earning capacity as a locksmith. The claimant's subsequent self-employment activity, however, aggravated his back symptoms. These were severely exacerbated by a safe-drilling incident in December 1981. Diagnostic testing then revealed a recurrent herniation. The medical evidence conflicted concerning whether this was a sudden or gradual change.

The employee petitioned to reopen the first injury claim. The administrative law judge denied reopening solely because the recurrent herniation was a new injury. This court rejected this defense. Relying on *O'Donnell*, we concluded that reopening applied because the first injury was a direct cause of the recurrent herniation and the employee's "nonindustrial activity" as a locksmith was reasonable. *Id.* 140 Ariz. at 449, 451, 682 P.2d at 454, 456.

■ The interrelationships among these cases are undoubtedly complex. But we find no necessary conflict. Rather, each case differently combines three factors. These factors are: (1) whether the employee's subsequent activity is an independently compensable injury by accident; (2) whether the first injury caused this subsequent activity to be injurious; and (3) whether this subsequent activity is industrially related.

Industrial Indemnity denies the relevancy of this last element. To the contrary, it is a necessary condition: the successive injury doctrine applies only if the last injury is industrial.

As noted in *Professional Furniture Service, supra*, the successive injury doctrine is a specialized application of the general principle that an employer takes the worker as he is. This rule was originally applied as a rule of compensability to reject the defense that an industrial injury would not have occurred but for a preexisting nonindustrial condition. *See, e.g., Schreven v. Industrial Commission*, 96 Ariz. 143, 393 P.2d 150 (1964). The rule was then extended to successive industrial injuries as a rule of liability preference: as between two or more potentially liable parties, the last in the chain is liable for the whole injury. *See, e.g., Caganich v. Industrial Commission*, 108 Ariz. 580, 503 P.2d 801 (1972). *Professional Furniture Service* is in this line of authority.

The justification for this nonapportionment is pragmatic:

> [A]pportionment ... would be the ideal theory in a perfect world, i.e., a world in which all previous insurers were within the jurisdiction of the board, and the proportional disability which occurred when each was at risk could be easily measured. Obviously, however, this is not a perfect world....
>
> [A]ssigning liability to the employer on risk at the time of the last injury, is easier to administer than the apportionment solution and, in most instances, will provide the highest level of benefits for the claimant.

4 A. Larson, *Workmen's Compensation* § 95.12 at 17–111 to –112 (1984) (footnotes omitted).

This rule of liability preference therefore does not establish a new injury defense. The general principle that "an employer takes his worker as he is" of necessity applies only if there is a responsible employer. In *Dutton*, there was no such employer. Although the employee was self-employed, the carrier responsible for the first injury had rehabilitated him for this self-employment. The reherniation occurred within the first few months of this activity. The *Dutton* court properly refused to extend the rule of liability preference to these facts.

Industrial Indemnity and Western argue that medical causation alone distinguishes these cases. To the contrary, in each one causation was joint; both the first injury and the subsequent activity contributed to the current condition. Furthermore, the relative weight of contribution is immaterial. *See* 4 A. Larson, *supra*, at 17–121.

Indeed, the subsequent activity may be merely the proverbial last straw.

■ In *Professional Furniture Service, supra,* all three factors supported the application of the successive injury doctrine. First, a specific new trauma contributed to the new condition. It therefore was an independently compensable injury by accident. Second, the first injury did not cause the new trauma to occur; rather, an unrelated slip on an oil slick caused it to occur. The contribution of the first injury was limited to worsening the injurious effect of this new trauma. Third, the new trauma was industrial. *Professional Furniture Service* therefore is the strongest possible case for applying the successive injury doctrine.

*O'Donnell* sharply contrasts with *Professional Furniture Service.* The key difference is the second element. In *O'Donnell,* the first injury directly caused the subsequent injurious activity. The employee had to stoop because of his previous knee impairment. This work-related stooping was the sole cause of his new back condition.

The other difference is that the new back condition developed gradually. There was no specific new trauma. This difference is less significant, however, because a gradual injury may be independently compensable. *See, e.g., Employers Mutual Liability Insurance Co. of Wisconsin v. Industrial Commission,* 24 Ariz.App. 427, 539 P.2d 541 (1975); *accord* 1B A. Larson, *Workmen's Compensation* § 39.00 (1980). Indeed, the *O'Donnell* court recognized that the gradual injury would have supported a new injury claim. This is so because the only cause of the new back condition was the work-related stooping.

*Dutton* differs from both of these cases in one significant way: the employee's self-employment was deemed nonindustrial. In addition, the second element distinguishes *Dutton* from *O'Donnell.* In Dutton, the first injury did not directly cause the sec-

ond injury to occur; it merely predisposed the employee to further injury.[1]

### B. Application

Comparing the present case to these precedents, we conclude it is most like *O'Donnell.* Unlike *Professional Furniture Service,* the claimant's degeneration was gradual. She suffered no new specific trauma. Unlike *Professional Furniture Service,* the chondral fracture, the first injury, caused the degeneration to occur. Without the first injury, the claimant's normal work would not have been injurious at all. Unlike *Dutton,* the claimant's work in part contributed to the degeneration. Also, the first injury is more than a mere predisposition; rather, it made the claimant's subsequent activity injurious.

■ This comparison to *O'Donnell,* however, does not justify the award. The award imposed responsibility on Mission. *O'Donnell* merely creates an exclusive option. The claimant may choose to petition to reopen or file a new injury claim, or both. The facts may support one or the other remedy or both. If the facts support both remedies, the claimant alone has the option of selecting between them. However, the claimant cannot collect benefits from both carriers for the same injury. *O'Donnell v. Industrial Commission, supra.*

Consequently, to justify the award, *O'Donnell* itself must be distinguished. The distinction concerns the first element. In *O'Donnell,* the gradual injury was uniquely work-related. The employee stooped only at work and this stooping was the sole cause of the new back condition. In contrast, in the present case, all weight-bearing activity contributed to the degeneration of the claimant's knee. The unique relationship to work, therefore, is lacking.

Dictum in one case indicates that such an industrial contribution is not an independently compensable injury by accident un-

---

1. This extension of *O'Donnell* to a predisposition has been questioned. *See East v. Industrial Commission,* 137 Ariz. 315, 670 P.2d 420 (App.

1983) (dictum). *Dutton* itself criticizes *East. Dutton v. Industrial Commission,* 140 Ariz. at 451–52, 682 P.2d at 456–67.

less "the work activity actually caused a disability which would not have existed separate and apart from the work activities involved." *Montgomery Ward Co. v. Industrial Commission,* 14 Ariz.App. 21, 480 P.2d 358 (1971). Other jurisdictions have reached similar results. *See Central State Hospital v. James,* 147 Ga.App. 308, 248 S.E.2d 678 (1978) (successive injury doctrine inapplicable to preexisting condition aggravated by wear and tear of ordinary life and normal activity); *Zerofski's Case,* 385 Mass. 590, 433 N.E.2d 869 (1982) (successive injury doctrine inapplicable to preexisting condition aggravated by standing and walking because these activities are "simply too common among necessary human activities to constitute identifiable conditions of employment." *Id.* 433 N.E.2d at 872).

In the present case, the medical evidence on this vital point conflicted. Dr. Kaplan testified that the claimant's heavy work accelerated the degeneration. Such a work-related acceleration is an independently compensable injury. *See, e.g., McNeely v. Industrial Commission,* 108 Ariz. 453, 501 P.2d 555 (1972) (normal work accelerating the fatal effect of a nonindustrial infarction is a compensable industrial injury). On the other hand, Dr. Moczynski testified that the disabling degeneration would have occurred even if the claimant had not worked.

The administrative law judge is the sole arbiter of witness credibility. *E.g., Perry v. Industrial Commission,* 112 Ariz. 397, 542 P.2d 1096 (1975). Unfortunately, in the present case the administrative law judge failed to resolve this conflict. Rather, he focused on the unanimous opinion that the claimant's work was injurious only because of the first injury. The findings therefore are inadequate for us to determine whether *O'Donnell* is distinguishable. Furthermore, our authority on review is limited to affirming or setting aside an award. *See* A.R.S. § 23–951(D); *e.g., Arrowhead Press, Inc. v. Industrial Commission,* 134

Ariz. 21, 653 P.2d 371 (App.1982). We therefore must set aside this award.

Award set aside.

CONTRERAS, P.J., and KLEINSCHMIDT, J., concur.