731 P.2d 90

**INDUSTRIAL INDEMNITY COMPANY, Petitioner,**

v.

**The INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**Custom Carpet Cleaners & Layers, Respondent Employer,**

**EBI Insurance Company, Respondent Carrier,**

**Charles E. Whallon, Respondent Employee.**

**No. 1 CA–IC 3389.**

Court of Appeals of Arizona, Division 1, Department C.

July 8, 1986.

Reconsideration Denied Aug. 25, 1986.

Lewis and Roca by Merton E. Marks, R. Kent Klein and Stephen M. Bressler, Phoenix, for respondent employer and respondent carrier.

Gorey, Delaney & Melkonoff by Edgar M. Delaney, Phoenix, for respondent employee.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears, P.A. by Larry L. Smith and Lawrence H. Lieberman, Phoenix, for petitioner.

Dennis P. Kavanaugh, Chief Counsel, Phoenix, for respondent Indus. Com'n of Arizona.

## OPINION

HAIRE, Judge.

This is a review of a consolidated Industrial Commission award entered in a workers' compensation proceeding granting reopening of a 1975 claim but denying compensability of a 1984 new injury claim. We must decide whether there is a new injury if the sole effect of recent work activity is to exacerbate the symptoms of an already symptomatic back condition, but where this exacerbation requires new medical treatment and causes increased disability. Because such an exacerbation is a new injury, we set aside the award.

The respondent employee (claimant) first injured his back in 1975 working as a carpet layer for the respondent employer. Petitioner Industrial Indemnity was the responsible carrier at that time. Disk surgery was performed in July 1975, but symptoms of low back and right extremity pain persisted. The claimant was then referred to orthopedic surgeon Richard Morgan, M.D., who performed a fusion in April 1976. The back condition, however, remained symptomatic, and Dr. Morgan admonished the claimant to avoid heavy work, such as carpet laying.

In September 1978, Industrial Indemnity closed the 1975 claim with a 25% permanent impairment. Claimant was initially awarded permanent partial disability benefits based on his capacity to work as a truck driver. When this work proved to be too painful, claimant returned to his former employer as a supervisor. Because this job paid as much as claimant's pre-injury work, Industrial Indemnity successfully obtained rearrangement of the prior partial disability award so as to eliminate disability compensation benefits.

While working as a supervisor, claimant had symptomatic occasional flare-ups that further restricted his work. In 1982, he returned to Dr. Morgan complaining of low back and radiating left extremity pain. Dr. Morgan recommended that the 1975 claim be reopened for additional treatment. Claimant withdrew his 1982 reopening petition, however, when Industrial Indemnity allowed him supportive care, including pain medication and quarterly visits to Dr. Morgan.

Early in 1984, claimant began doing heavier work because his employer laid off his helpers. His back pain worsened, but initially he was able to control it with medication and exercise. On May 1, 1984, while in Tucson to install some carpet, claimant allegedly had to move a heavy dresser. Although his symptoms did not immediately change, they progressively worsened over the next three days. Claimant was hospitalized on May 4th and has remained disabled since that time.

Thereafter, claimant filed another petition to reopen the 1975 claim, asserting that "[a]fter driving to Tucson—3 days ago—had exacerbation of acute low back pain requiring medical care," but also denying that any other accident had occurred since the closure of the 1975 claim. When Industrial Indemnity denied this petition, claimant requested a hearing and also filed a new injury claim, alleging that his "back started hurting about 5-3-84 until [he] couldn't move." The carrier responsible for this new injury claim, respondent EBI Insurance Company (EBI), denied it.

Claimant also requested a hearing concerning the denial of his new injury claim. The two claims were then consolidated for hearing and disposition.

Claimant and Drs. Morgan and Harrington appeared at the scheduled hearings. Claimant described the heavy work performed in Tucson in May 1984, and his symptoms before and after it:

"I went to Tucson. We drove up to Tucson, and we were laying carpet. In the meantime, we had to take and move furniture from one bedroom to another; and in one bedroom there was a big dresser, and there was only myself and a helper. And we had to pick it up and take it outside. They had big doors that we could take it out. And we picked it up, took it outside, and we had to bring it back in that night. And my pain was getting worse then.

"Q. What do you mean it was getting worse?

"A. Well, it was *just on a gradual scale*. It just kept getting worse. *I don't know if it was picking up the desk that helped it along a little more.* Then after I got back from Tucson, we had to go to work at night at the EF Hutton Company, and we had to lug—there was three of us. We had to lug carpet around and that, and I just couldn't do it. And the other two men lugged the carpet in there, and finally I just couldn't—Friday morning, I went to the doctor and they put me in the hospital.

"Q. Were you having pain prior to May 1st of 1984 when you were in Tucson or whatever date that was?

"A. *I had some pain. I had pain all the time, but,* I mean, *it wasn't getting worse.* It was just there.

\* \* \* \* \* \*

"Q. In terms of what you felt, is it your testimony your level of pain was about the same for a year until you moved that furniture in Tucson?

"A. No.

"Q. Tell me.

"A. It wasn't the same. I'd got where I'd be walking and we'd crawl around on the floor a lot and it would get tight, and I'd get up or I'd lie down and do my exercise and the *pain would subside. But after when I went to Tucson,* after that, going to Tucson, lifting the desk, coming back, going to EF Hutton and working, *it just got worse.*

\* \* \* \* \* \*

"Q. And as far as the work you did down there, when you lifted the dresser, *you didn't have an immediate onset of pain lifting the dresser; did you?*

"A. *No.*

\* \* \* \* \* \*

"A. It was that night when I came back from Tucson and it kept getting worse. *But I thought with my exercise and everything I could work it out.*

"Q. *Like before?*

"A. *Yes, but it did not work out.*

"Q. *This time it didn't work out.*

"A. *No, sir.*"

(Emphasis added).

Dr. Morgan testified that at the hospital on May 4, 1984 claimant described a flare-up of back pain as having developed after laying carpet in Tucson a few days earlier. In response to a hypothetical question that assumed that claimant had moved a heavy desk as well as laid carpet in Tucson, Dr. Morgan testified that this activity aggravated the symptoms of the underlying condition. On the other hand, he confirmed that diagnostic testing revealed no new objective physical condition related to the recent work activity. It did, however, show significant fibrosis (scarring) related to the original injury and surgeries. Although fibrosis can cause symptoms without activity, in Dr. Morgan's opinion this "level of that symptomatology usually is fairly controlled with some rest, heat, aspirin and not necessarily seeing the orthopedist, not necessarily." Finally, Dr. Morgan testified that because of the underlying condition, claimant had certain physical limits and would have increased pain whenever he exceeded them.

Dr. Harrington testified that he first examined claimant on June 14, 1984 and received a history of increased pain which had begun approximately one year earlier. According to Dr. Harrington, the diagnostic testing revealed fibrosis and mild peripheral neuropathy. Neither condition was related to recent work activity. Dr. Harrington conceded that heavy work could aggravate the symptoms of the underlying condition but deferred to Dr. Morgan concerning the cause of the current aggravation:

> "Well, I really can't speak to that in terms of how much he did and everything else. It's not in my records and I don't think I talked to him directly about it. He apparently got much worse in May, and doctor—the note I have from Dr. Morgan indicates this could follow his trip to Tucson, his work in Tucson working as a carpet cutter, and I have to really defer an answer on that to both the people that saw him in May and the patient."

The administrative law judge then issued the award granting reopening but making no specific finding about the new injury claim. On administrative review, Industrial Indemnity asserted that claimant had suffered a new injury and therefore that the successive injury doctrine applied to this case. EBI's response denied this, relying in part on *Dutton v. Industrial Commission*, 140 Ariz. 448, 682 P.2d 453 (App. 1984) and *O'Donnell v. Industrial Commission*, 125 Ariz. 358, 609 P.2d 1058 (App. 1979). The decision upon review affirmed the award with the following amendment:

> "5.A Regarding the new injury claim filed on June 20, 1984, Industrial Indemnity Co., in its REQUEST FOR REVIEW urges that there should be a negative finding. This would not be inappropriate. *Stange Co. v. Industrial Commission*, 585 P.2d 261, 120 Ariz. 241 (App. 1978). Assigning dual responsibility would be. *O'Donnell v. Industrial Commission*, 609 P.2d 1058, 125 Ariz. 358 (App. (1979). There is *no specific episode* described by applicant which brought on his May 1984 pains. As indi-

cated in Finding Number 5, applicant has had *continuing problems* since the closure of his first claim in 1978 culminating in his hospitalization in 1984. *While increased activity in May 1984 and preceding may have exacerbated the underlying condition, there was no diagnosable condition related thereto and no new injury, gradual or otherwise.* Under the circumstances, applicant has not carried his burden of proving a new injury took place on or about May 3, 1984." (Emphasis added).

On review in this court, Industrial Indemnity argues that the exacerbation of symptoms is a new injury. If so, the argument continues, the successive injury doctrine applies and EBI is wholly responsible for the compensable consequences of this exacerbation.

 Recent authority confirms Industrial Indemnity's successive injury argument. *See Pearce Development v. Industrial Commission*, 147 Ariz. 598, 712 P.2d 445 (App.1985); analysis of successive doctrine *approved and adopted*, 147 Ariz. 582, 712 P.2d 429 (1985); *accord Vishinkas v. Industrial Commission*, 147 Ariz. 574, 711 P.2d 1247 (App.1985). The successive injury doctrine is "a rule of liability preference: as between two or more potentially liable parties, the last in the chain is liable for the whole injury." *Pearce*, 712 P.2d at 449. But the administrative law judge's conclusion that the evidence satisfied the legal standard for reopening is not sufficient to justify the award. The same evidence may also satisfy the legal standard for a new injury. *See Vishinkas*, 711 P.2d at 1250. If so, the successive injury doctrine would shift liability to the new injury carrier, EBI.

The dispositive question, therefore, is whether the exacerbation of symptoms constitutes a new injury. Industrial Indemnity's argument in this regard is straightforward: the elements of a new injury are (a) causation and (b) compensable consequences. In short, if recent work activity causes the need for new medical treatment

or increased disability, there is a new injury and the successive injury doctrine applies.

■ EBI asserts that something more is required: either a specific precipitant or an organic change. Although a specific incident certainly is sufficient, we disagree that it is necessary. A gradual injury is independently compensable. *See, e.g., Employers Mutual Liability Ins. Co. v. Industrial Commission*, 24 Ariz.App. 427, 539 P.2d 541 (1975); *accord* 1B A. Larson, *Workmen's Compensation Law* § 39.00 *et seq.* (1986). As we noted in *Pearce*, even *O'Donnell*, which permitted reopening, recognized that the gradual back injury would have supported a new injury claim. *See Pearce*, 712 P.2d at 448.

■ The requirement of an organic change necessitates more detailed analysis. Of course, an organic change is sufficient to establish a new injury. *See, e.g., Caganich v. Industrial Commission*, 108 Ariz. 580, 503 P.2d 801 (1972). Furthermore, if the recent work activity causes organic change, the underlying condition itself generally becomes the responsibility of the new injury carrier. *Id.* A mere symptomatic aggravation does not have this latter consequence. *Cf. New Pueblo Constructors v. Industrial Commission*, 115 Ariz. 236, 564 P.2d 925 (App.1977); *accord Stange Co. v. Industrial Commission*, 120 Ariz. 241, 585 P.2d 261 (App.1978). In the present case, however, Industrial Indemnity does not claim that responsibility for the underlying condition has shifted to EBI. The sole dispute concerns the responsibility for the compensable consequences of the exacerbated symptoms.

Given this difference, it does not follow that an anatomical change is necessary to prove a compensable aggravation, i.e., a new injury. Indeed, one of the leading cases involved a symptomatic aggravation. *See Schreven v. Industrial Commission*, 96 Ariz. 143, 393 P.2d 150 (1964). There, an industrially related strain injury did not anatomically worsen a congenital spine deformity, but it did "trigger" the symptoms of the previously asymptomatic deformity.

*Schreven* arguably is distinguishable because the underlying condition was congenital, not industrial. This distinction is relevant only if a different test for a new injury applies if the underlying condition is industrial. Our supreme court, however, has applied the same test to both kinds of underlying conditions. *Compare Schreven with Caganich v. Industrial Commission, supra.*

A second distinction is that the underlying condition in *Schreven* was asymptomatic until the industrial injury; in the present case, the underlying condition unquestionably was symptomatic. The recent work activity merely heightened the level of symptoms.

■ We conclude that such an exacerbation is a new injury. But for the recent work activity, the hospitalization and additional active treatment would not have been necessary. The clearest support for this conclusion is Dr. Morgan's testimony that supportive care probably would have controlled the symptoms of the underlying condition. In addition, the recent work activity caused additional disability. Because of the underlying condition claimant was restricted to light work. The exacerbation of symptoms has increased his disability. He is now disabled from even light work. This increased disability is therefore a compensable consequence of the recent work activity. *Cf. Montgomery Ward Co. v. Industrial Commission*, 14 Ariz.App. 21, 480 P.2d 358 (1971) (to establish compensable claim, employee must prove that the disability was greater than it would have been without the work contribution).

EBI also defends the award by arguing that the administrative law judge rejected the factual premise of Industrial Indemnity's argument and found that the hospitalization and disability were the result of a natural progression of the underlying condition. We disagree that the administrative law judge made this finding, and, even if he had, the record would not support such a finding. The administrative law judge's original finding accepted the claimant's basic history. The amended finding in the decision upon review conceded that the "increased activity in May 1984 and

preceding may have exacerbated the underlying condition...." Although Dr. Morgan may have been more definite than Dr. Harrington, they shared the opinion that the symptoms of the underlying condition had been aggravated.

We therefore conclude that the successive injury doctrine applies to this case. EBI therefore is responsible for the compensable consequences of the exacerbation of symptoms, but responsible for this alone.

The award is set aside.

EUBANK, P.J., and FROEB, J., concur.