784 P.2d 709

**INDUSTRIAL INDEMNITY COMPANY,**
Petitioner Carrier,

**O'Malley's Lumber Company,**
Petitioner Employer,

v.

**INDUSTRIAL COMMISSION OF
ARIZONA, Respondent,**

Dale F. Case, Respondent Employee.

**INDUSTRIAL INDEMNITY COMPANY,**
Petitioner Carrier,

v.

**INDUSTRIAL COMMISSION OF
ARIZONA, Respondent,**

Dale F. Case, Respondent Employee,

**O'Malley's Lumber Company,**
Respondent Employer,

**U.S. Fidelity & Guarantee Company,**
Respondent Carrier.

No. 1 CA–IC 88–148.

Court of Appeals of Arizona,
Division 1, Department C.

Nov. 14, 1989.

Redesignated as Opinion and
Publication Ordered Jan. 3, 1990.

Reconsideration Denied Jan. 3, 1990.

O'Connor, Cavanagh, Anderson, Westover, Killingsworth & Beshears by J. Victor Stoffa, Donald L. Cross, Phoenix, for petitioner carrier and employer.

Anita R. Valainis, Chief Counsel, The Industrial Com'n of Ariz., Phoenix, for respondent.

Delaney & Melkonoff, P.C. by Edgar M. Delaney, Phoenix, for respondent employee.

Junker & Doherty, P.C. by Julie A. Doherty, Phoenix, for respondent employer and carrier.

## MEMORANDUM DECISION ■

GERBER, Judge.

This action involves a dispute between successive workers' compensation carriers of a single employer. The administrative law judge (A.L.J.) concluded that a fall resulting when respondent employee (claimant) stepped backwards off an approximately one foot high platform was a compensable new injury even though a preexisting weakness predisposed him to fall when doing normal weight-bearing activity. The award imposed liability on the new injury carrier (Industrial Indemnity). The A.L.J. also determined that Industrial Indemnity was responsible for the August 1987 right knee surgery and denied petitions to reopen two prior industrial injury claims.

Industrial Indemnity raises three issues. First, whether the new injury arose from the employment because, in its view, stepping from a one foot height poses no risk of injury greater than ordinary movements in nonemployment life. Second, whether the A.L.J. improperly reached the issue of liability for the August 1987 surgery. Third, whether the medical evidence supported imposition of liability on Industrial Indemnity for this surgery.

We conclude that the new injury arose from the employment because claimant's work increased the risk of injury, that the A.L.J. properly reached the issue of liability for the surgery because this issue was consensually litigated, and that sufficient evidence supported the imposition of liability on Industrial Indemnity. We accordingly affirm the award.

Claimant has worked as a truss maker for the employer for several years. In January 1980, he injured his right knee at work when he stepped off a platform, turned, and the knee gave out. The responsible carrier (USF & G) accepted compensability. Medical benefits included open knee surgery for a medial meniscectomy. The anterior cruciate ligament also may have been removed. After approximately one month of disability, claimant returned to regular work. USF & G subsequently closed the claim without a finding of permanent impairment.

In February 1986, claimant again suffered injuries while working for the employer. He was injured when a stack of lumber fell and knocked him onto both of his knees. USF & G, which was again the responsible carrier, accepted compensability. In May 1986, claimant underwent arthroscopy. He returned to regular work within one week of this procedure. USF & G ultimately closed this claim without a finding of permanent impairment.

On May 13, 1987, claimant experienced a final episode of right knee instability at work. As he stepped off an approximately one foot high platform, he placed his full weight on his right leg. The right knee

collapsed, claimant fell to the ground, and suffered immediate, severe knee pain which prevented him from straightening the right knee. Claimant has not worked since this fall. In August 1987, he underwent a third surgery on the right knee.

Claimant filed petitions to reopen the earlier injury claims and also a new injury claim. All claims were denied. Following his protests, the claims were consolidated, Industrial Indemnity was directed to pay benefits pending an award, and hearings were conducted.

Claimant testified that he worked on his knees approximately fifty percent of the time. He was not asked any other general questions about activities required at work. He also testified that his leisure activities included coaching wrestling, which involved demonstrating maneuvers.

Regarding his prior injuries, claimant testified that he recovered from the first without apparent residuals. He had no symptoms at work or while coaching. In contrast, after the second injury and surgery, the right knee "felt loose and funny inside." He nevertheless discontinued physical therapy and did not return for a follow-up medical examination. He explained that physical therapy had improved the "separating sensation" and that he had been able to return to normal work and recreational activity. Claimant also testified that he was never given an explanation for his complaints of looseness.

According to claimant, he had no further difficulty until approximately one month before he fell at work.[1] In April 1987, the employer required claimant to wear work boots instead of tennis shoes. After claimant began wearing the boots, the feeling of looseness in his knee returned. He experienced three or four episodes when his knee partially gave way while he was working. One such episode occurred shortly before he fell. Claimant testified that he was injured when he set his saw, stepped backward off the platform where he was working, placed all his weight on his leg and his knee gave way. Claimant maintained that

as a result of the injury he could not flex his leg because the pain was too intense.

Glen R. Bair, M.D., the treating physician for the second injury, testified that claimant had unremarkable clinical findings when first examined in March 1986. Claimant, however, consistently complained of a "catching sensation," and Bair subsequently performed the May 1986 arthroscopy. The procedure revealed an absent anterior cruciate ligament, a mostly absent medial meniscus with a torn remnant, which was removed, and a normal lateral meniscus. While the right knee was anesthetized, Bair was able to document minimal evidence of cruciate deficiency. In Bair's opinion, although the records regarding the first injury and surgery were unclear, the ligament probably had been missing since 1980.

Bair did not attempt to repair the ligament because this surgery had not been authorized and because the degree of deficiency did not necessitate reconstruction. He did, however, recommend physical therapy to increase muscle strength to compensate for the cruciate deficiency. He also confirmed that claimant subsequently had discontinued treatment.

In August 1987, on the day before the third surgery, Bair reexamined claimant. Although the acute symptoms of pain and swelling had "basically resolved," there was evidence of increased right knee looseness. In his opinion, this increased looseness was the result of the natural progression of a cruciate deficient knee rather than a new injury because, according to Bair, "I don't consider stepping up and down off a stool or back-walking, walking backwards, a significant-injury situation." He explained that the menisci serve as secondary stabilizers when a cruciate ligament is lost. In a certain percentage of cases, degenerative tears develop in the medial and then the lateral meniscus. The resulting instability progressively worsens until the knee becomes untrustworthy. In claimant's case, Bair stated that although the acute

1. A claims representative for Industrial Indemnity testified that claimant had reported having "giving way" symptoms since 1986 but had not specified their frequency.

symptoms started after he stepped backwards and fell, such problems

> ... are going to happen pretty much independent of what he is doing. It is just sort of a—a thing that just occurs.
>
> And it doesn't make any difference whether you are, you know, walking to the bathroom, or you are climbing in and out of your truck, or whatever it may be. You are—the thing just gradually loosens up and eventually you will tear your lateral meniscus, you will get more and more pivot shifting, and you have got the problems.

Following claimant's May 1987 injury, he was initially examined by Kurt Steinke, D.O. Steinke testified it was his opinion that the claimant suffered some type of internal injury to his knee as a result of the May 1987 incident. Steinke further stated, however, that he could not assess the full extent of the injury.

Richard J. Emerson, D.O., the treating surgeon after the May 1987 episode, reported receiving the following history from claimant:

> 'About three weeks the patient was required to wear heavy-duty boots for work. He—something on a platform—starts on a platform and gets up and down. Starting having pain on the lateral side of his right knee. Knee collapsed times two with pain and swelling. He set the saw and stepped back down off platform with all the weight on his right leg. Felt that his right knee hyperextended and shifted outward to the lateral side.'

Emerson confirmed that claimant had a cruciate deficient knee. In his opinion, this injury could have occurred at any time until a few weeks before the 1986 surgery.

Emerson testified that during the August 1987 surgery he reconstructed the anterior cruciate ligament and performed a partial lateral meniscectomy. The meniscectomy was required to repair tears of the lateral meniscus. These tears had both old and new components. He testified that the tears were consistent with degeneration secondary to the cruciate deficiency, but he also conceded that claimant's acute symptoms in May 1987 were consistent with a new tear. This contradicted his surgical report in which he had related the tears to the underlying condition. When asked directly whether the May 1987 episode caused an additional tear, Emerson stated that the tears were present in 1986. In contrast, when asked generally whether the episode on May 13, 1987 had aggravated the absence of the cruciate ligament, he responded:

> I don't think there's any question about that. He still had some meniscus tissue left— ... and his knee was unstable. And if the knee is unstable, you're going to have more cartilage injury as long as the knee is unstable.

Emerson agreed that the May 1987 episode contributed to the acute symptoms; but he was unclear whether the August 1987 surgery had to be performed at that time because of these acute symptoms:

> Q. ... My question is this: One of the reasons you did surgery when you did was the nature of his acute symptoms?
>
> A. Possibly. Not in total. I mean, the situation presented to us at the time was an individual who's had continued problems with his knee and a more recent episode, which in a few weeks that would go away, the swelling, just limiting his activities.
>
> Q. The torn meniscus would go away?
>
> A. The torn meniscus won't go away, the symptoms would just with rest and elevation and ice, until he was placed in a situation of putting demands on the knee again.
>
> Q. You mean—
>
> A. Then, the same thing is going to happen.

Moreover, Emerson had previously recommended conservative care as one treatment option even though he suspected the lateral meniscus was torn. However, he conceded that both the cruciate ligament and the torn meniscus required treatment. Emerson testified that the May 1987 episode was only possibly the last straw and that he had performed the August 1987 surgery primarily to reconstruct the anterior cruciate

ligament but also to repair the lateral meniscus.

The A.L.J. then issued the award. He found that Emerson had testified that the May 1987 episode aggravated the problem of the missing ligament, did some damage to the lateral meniscus, and started the acute symptoms. The August 1987 surgery was necessary to repair both the cruciate ligament and the torn meniscus. Relying on the successive injury doctrine, he then concluded that the May 1987 episode was a compensable new injury and also that this new injury was the legal cause for Emerson's medical treatment. The A.L.J. denied the petitions to reopen. After affirmance on administrative review, this special action followed.

The first issue on review is whether the May 1987 episode arose out of claimant's employment. Industrial Indemnity claims that it did not because the risk of injury from employment was no greater than the risk from similar normal weight-bearing activities at home. We conclude that claimant's work did increase the risk of injury and hence the injury arose out of his employment. We accordingly need not address the argument that a lesser legal standard would be unconstitutional.

The statutory requirements of compensability are (1) an injury (2) by accident (3) arising out of and in the course of employment. *See* A.R.S. § 23–1021. The "arising out of" element requires a connection between the employment and the risk resulting in the injury. *See, e.g., Royall v. Industrial Comm'n*, 106 Ariz. 346, 476 P.2d 156 (1970). An increased risk of injury related to work satisfies this standard. *See, e.g.,* 1 A. Larson, *Workmen's Compensation Law* § 6.30 (1989).

■ For the purpose of this review, we assume that the risk posed by each particular act of stepping backwards off a one foot high platform is no greater than the risk posed by many ordinary activities, such as climbing out of a truck or walking down a stairway. This assumption, however, does not extend to routine walking. Although Bair testified that cruciate deficiency can progress to a degree that activi-

ties such as walking pose a risk of injury, claimant testified that episodes of instability beyond mere feelings of looseness had occurred only at work while wearing work boots and when stepping off the platform. Bair's testimony was insufficient to establish that claimant's condition had actually progressed to the degree that the knee was unstable while claimant was walking. *Cf. Hunter v. Industrial Comm'n*, 130 Ariz. 59, 633 P.2d 1052 (App.1981) (medical opinion inadequate where without factual foundation). Furthermore, potential future progression is no defense to the compensability of actual present symptoms. *See, e.g., Schreven v. Industrial Comm'n*, 96 Ariz. 143, 393 P.2d 150 (1964).

These distinctions, however, do not answer Industrial Indemnity's argument that claimant's injury did not arise out of his employment. A complete answer requires a comparison of sequences, not just isolated actions. Even if a single act of stepping off the platform is no more stressful than the ordinary act of climbing out of a truck, one does not ordinarily repetitively climb out of a truck throughout an eight to ten hour period. In contrast, claimant's work did require him to step off and back onto the platform repetitively. Although the record on this point could have been more definite, claimant did testify about several episodes of instability occurring when he stepped off the platform. Emerson recorded a history of such repeated activity.

We do not suggest that the cumulative effect of this activity resulted in increased strain. Absent medical evidence, we can only speculate about the possible effect of fatigue. Repeating a risky activity, however, increases the risk that an injury will occur.

Industrial Indemnity concedes that an employer must take an employee "as is" and that the relative importance of contributing causes is immaterial. *See, e.g., Pearce Development v. Industrial Comm'n*, 147 Ariz. 598, 602–03, 712 P.2d 445, 449–50 (App.1985), *approved in part* 147 Ariz. 582, 712 P.2d 429 (1985). It has not been argued that the May 1987 episode is noncompensable merely because it would

not have occurred but for the cruciate deficiency or because the cruciate deficiency predominantly caused the fall. Industrial Indemnity also concedes claimant suffered a compensable symptomatic aggravation if the fall arose out of his employment. Because the fall did arise out of the employment, the A.L.J. correctly concluded that the new injury claim was compensable.

The next issue on review is whether the A.L.J. improperly reached the issue of liability for the August 1987 surgery. Industrial Indemnity asserts that the A.L.J. adjudicated this issue but should have restricted the award to compensability alone.

The A.L.J. clearly reached the liability issue. Although he awarded only general temporary benefits as provided by law, he found that the new injury was the legal cause of the August 1987 surgery. USF & G does not suggest that the A.L.J. reserved judgment on liability for this surgery. Rather, it argues that the issue was consensually litigated. We turn now to the question of whether the issue of liability may be consensually litigated.

■ Compensability and temporary benefit issues generally are adjudicated separately, but the parties may consent to litigate them together. *See Arellano v. Industrial Comm'n*, 25 Ariz.App. 598, 545 P.2d 446 (1976). Such consent occurred in *Arellano* because (1) the claimant's hearing request claimed a continuing disability and the carrier submitted a medical report indicating that the industrial injury was stationary and requested a subpoena for its author and (2) claimant's counsel did not object to testimony concerning temporary benefits and attempted to prove that the industrial injury was not yet stationary. *Id.* at 599, 545 P.2d 446.

■ Although some of these factors do not apply to the current case, the record establishes that Industrial Indemnity consented to litigate liability for the August, 1987 surgery. Claimant's hearing request did not mention the August 1987 surgery, but this is unsurprising because the request was filed in June 1987. Claimant filed Emerson's report of surgery approximately six weeks before the first scheduled hearing and approximately seven months before Emerson testified. This report included conclusions about the cause of the surgery. Industrial Indemnity never objected to the materiality of these conclusions. More important, when Emerson appeared, Industrial Indemnity actively sought to establish that the surgery was unrelated to the new injury.

Industrial Indemnity now argues that it could not have objected to Emerson's causation opinion because it was relevant to reopening. To the contrary, the scope of necessary medical treatment is no more relevant to reopening than it is to compensability. *See Sneed v. Industrial Comm'n*, 124 Ariz. 357, 604 P.2d 621 (1980). A new treatment for an unchanged condition does justify reopening. *See Stainless Manufacturing Co. v. Industrial Comm'n*, 144 Ariz. 12, 695 P.2d 261 (1985). But claimant's petitions were based on a changed condition (restricted mobility) and its connection to the prior injuries.

■ The last issue on review is whether the medical evidence supports imposition of liability on Industrial Indemnity for the August 1987 surgery. Our standard of review requires us to consider the evidence as a whole, *see, e.g., Sloan v. Industrial Comm'n*, 14 Ariz.App. 354, 483 P.2d 586 (1971), but in a light most favorable to affirming the award. *Salt River Project v. Industrial Comm'n*, 128 Ariz. 541, 627 P.2d 692 (1981). We find that the medical evidence supports imposition of liability on Industrial Indemnity.

■ Under the successive injury doctrine, a worker's underlying condition may become the responsibility of a new injury carrier if work activity causes organic change in the underlying condition. *Industrial Indemnity Co. v. Industrial Comm'n*, 152 Ariz. 195, 731 P.2d 90 (App. 1986). A new injury carrier will not be responsible for the underlying condition, however, if a worker only exhibits symptoms of the injury absent some underlying organic change. *Id.* A new injury carrier is responsible for symptomatic aggravation if it requires treatment or causes additional

disability. A carrier's responsibility for symptomatic aggravation, however, is separate from the question of whether a new injury carrier is responsible for treatment of an underlying condition.

■ Viewing the evidence in the present case in a light most favorable to sustaining the award, we find that the A.L.J. made factual findings, supported by the record, which justify imposing liability on Industrial Indemnity under the successive injury doctrine. The A.L.J. found that the initial examining physician had observed marked swelling after the May 13, 1987 injury. In his opinion that accident caused internal damage to claimant's knee. Other testimony established that while claimant's lateral meniscus had older tears in it, newer tears were also present. Testimony also supported the A.L.J.'s finding that the injury on May 13, 1987 resulted in claimant's acute symptoms (pain, swelling, inability to straighten his leg) and aggravated damage to claimant's lateral meniscus. The testimony supports a finding not only of symptoms of the injury but an underlying organic change. The record bears out that surgery was performed in part to repair claimant's lateral meniscus; Emerson, the operating physician went so far as to state that the lateral meniscus would not heal on its own absent surgery. This testimony further supports the finding of an organic change in claimant's knee.

The record therefore supports the A.L.J.'s finding that an organic change occurred in claimant's knee as a result of his injury on May 13, 1987. Under the doctrine of successive injury, Industrial Indemnity is liable for the costs associated with claimant's injury on May 13, 1987.

Industrial Indemnity asserts that the A.L.J. incorrectly imposed liability because the August 1987 surgery was performed to repair the anterior cruciate ligament, the main stabilizing device in the knee, and that ligament had previously been removed from the knee. This argument lacks merit. The August 1987 operation was performed both to repair damage to the claimant's knee and to stabilize the joint. Other features within the joint stabilize the knee. The repairs, then, could be effected to reestablish stability in the joint in spite of the absence of the anterior cruciate ligament since the additional new damage to the meniscus aggravated overall instability.

For the foregoing reasons, we conclude that claimant suffered a new injury arising out of his employment in May 1987 and that the medical evidence is sufficient to impose liability on Industrial Indemnity for the August 1987 surgery. We accordingly affirm the award. Both USF & G and Industrial Indemnity have requested attorney's fees. In the exercise of our discretion, we deny both requests.

EUBANK and SARGEANT, JJ., concur.

NOTE: The Honorable WILLIAM P. SARGEANT, III of the Maricopa County Superior Court, State of Arizona, has been authorized to participate in this matter by the Chief Justice of the Arizona Supreme Court, pursuant to Ariz. Const. art. VI, § 3.