25 P.3d 1164

**SOUTHWEST GAS CORPORATION, Petitioner Employer and Insurer,**

v.

**THE INDUSTRIAL COMMISSION OF ARIZONA, Respondent,**

**State Compensation Fund, Respondent Insurer,**

**Stephen J. Harczak, Respondent Employee.**

No. 2 CA–IC 00–0012.

Court of Appeals of Arizona. Division 2, Department B.

May 29, 2001.

---

Ronald H. Moore, P.C., By Ronald H. Moore, Phoenix, for Petitioner Employer and Insurer.

The Industrial Commission of Arizona, By Anita R. Valainis, Phoenix, for Respondent.

State Compensation Fund, By James F. Crane and Robert A. Schuler, Tucson, for Respondent Insurer.

Julie Ferdon, Brian Clymer, Tucson, for Respondent Employee.

### OPINION

DRUKE, J.

¶ 1 Petitioner Southwest Gas Corporation (SWG) brings this statutory special action to review an adverse award entered by an administrative law judge (ALJ) on respondent Stephen Harczak's claim for workers' compensation benefits. SWG contends the ALJ erred in finding that the successive injury doctrine applied and that Harczak did not need to request a change of physicians pursuant to A.R.S. § 23–1070(E). Although we agree with the ALJ's first finding, we disagree with the second and, thus, set aside the award.

¶ 2 We view the evidence in the light most favorable to sustaining an ALJ's award. *Rent A Center v. Industrial Comm'n*, 191 Ariz. 406, 956 P.2d 533 (App.1998). And we defer to the ALJ's factual determinations that are reasonably supported by the evidence but draw our own legal conclusions from those facts. *A.J. Bayless v. Industrial Comm'n*, 179 Ariz. 434, 880 P.2d 654 (App. 1993).

### Facts and Procedural Background

¶ 3 Harczak injured his right elbow in June 1988, while employed by SWG. At the time, SWG was insured by the State Compensation Fund, which accepted Harczak's claim for workers' compensation benefits. Dr. Madden performed surgery on Harczak's right elbow in 1989 and later released him for work. In 1990, the Fund closed the claim without a finding of permanent disability.

¶ 4 Harczak again injured his right elbow while working at SWG on March 6, 1997. SWG, which had become self-insured, accepted Harczak's claim for benefits. SWG's doctor treated Harczak initially and then referred him to Dr. Wood, who surgically repaired the injury, a fractured elbow spur. In December 1997, SWG closed the claim with a finding of five percent permanent impairment, and Harczak requested a hearing. Also, because Harczak had continued to experience pain in his right arm after the surgery, he began seeing Dr. Glynn, a private physician, who diagnosed a compressed ulnar nerve in the right elbow and referred him for decompression surgery.

¶ 5 ALJ Ireson conducted three days of hearings over several months on whether closure of the claim was appropriate. At the first hearing, SWG raised the issue of whether Harczak had requested a change of physicians from its doctors to Dr. Glynn, as required by § 23–1070(E). The relevant part of the statute provides:

> If the medical, surgical or hospital aid or treatment being furnished by [a self-insured] employer is such that there is reasonable ground to believe that the health, life or recovery of any employee is endangered or impaired thereby, the [Industrial Commission of Arizona] may, upon application of the employee or upon its own motion, order a change of physicians or other conditions.

Four days after that hearing, Harczak's counsel sent ALJ Ireson a letter requesting "that the Commission 'upon its own motion' order a change of physicians" or, alternatively, that the ALJ consider the letter a request "for [a] hearing in this matter" or "to change physicians to Dr. Glynn since [SWG has] terminated active treatment in [the] case and

[Harczak] requires further treatment to allow him to recover from his injury." Counsel concluded the letter by stating that Harczak "would have no objection to deferring the taking of any evidence on this issue until after a decision has been made on whether his case should be kept open for treatment or not." In response, SWG objected to the change, noting that "an evidentiary hearing may be necessary."

¶ 6 ALJ Ireson later resumed the closure hearings and heard testimony from Drs. Glynn, Madden, and Wood. In his subsequent award, the ALJ adopted Dr. Glynn's testimony as "more probably correct" and found that Harczak has had "continuing complaints" even though his "symptoms did improve after [Dr. Wood's] surgery" and that his claim "should remain open for continuing benefits." ALJ Ireson thus awarded Harczak "[m]edical, surgical and hospital benefits as provided by law from March 6, 1997." The ALJ did not expressly order a change of physicians but noted that decompression surgery had been performed on Harczak's right elbow in September 1998. ALJ Ireson affirmed the award on administrative review, and the award became final pursuant to A.R.S. § 23–943(H).

¶ 7 Harczak then sought payment from SWG for the 1998 surgery. When SWG refused to pay, Harczak requested a hearing pursuant to A.R.S. § 23–1061(J), which requires a hearing if it appears a claimant has been improperly denied benefits.[1] At the hearing, ALJ Elber discussed ALJ Ireson's award with counsel and requested memoranda of law on the relevant issues. After counsel submitted memoranda, ALJ Elber issued an award imposing liability on SWG for the 1998 surgery, finding that ALJ Ireson's award had rendered the change-of-physicians issue moot and that the successive injury doctrine applied.[2] SWG requested administrative review, ALJ Elber affirmed the award, and this special action followed.

### Successive Injury Doctrine

¶ 8 We first address ALJ Elber's ruling on the successive injury doctrine, which "is a specialized application of the general principle that an employer takes the worker as he is." *Pearce Dev. v. Industrial Comm'n,* 147 Ariz. 598, 602, 712 P.2d 445, 449 (App.1985), *vacated in part on other grounds,* 147 Ariz. 582, 712 P.2d 429 (1985). The doctrine is "a rule of liability preference: as between two or more potentially liable parties, the last in the chain is liable for the whole injury." *Id.* We apply the doctrine when the evidence establishes that the new injury is an independently compensable industrial injury and that the old and new injuries have both contributed to the employee's current condition. *Id.*

¶ 9 SWG contends ALJ Elber erred in applying the doctrine because she did so "without benefit of an evidentiary hearing." SWG argues that "medical testimony should have been considered ... not only to address the underlying issue of causal relationship but to satisfy the requirements of [the doctrine]." Relying on *Industrial Indemnity Co. v. Industrial Commission,* 162 Ariz. 503, 508, 784 P.2d 709, 714 (App.1989), SWG claims the evidence failed to establish that the March 1997 industrial injury caused "an organic change in the underlying condition." We disagree.

¶ 10 In *Industrial Indemnity,* we stated that "[a] new injury carrier will not be responsible for the underlying condition ... absent some underlying organic change" in the condition. *Id.* at 508, 784 P.2d at 714. There, based on the presence of new tears in the lateral meniscus of the claimant's right knee after the new injury, we held that the evidence showed an organic change in the claimant's condition and thus applied the successive injury doctrine.

¶ 11 Similarly, the evidence presented to ALJ Ireson established that an organic change occurred in Harczak's right ulnar nerve as a result of the 1997 injury. Dr. Madden testified that he had found the nerve

---

1. Harczak had also requested a hearing on the Fund's denial of his petition to reopen the 1988 claim, and that hearing was consolidated with the § 23–1061(J) hearing.

2. The ALJ also dismissed Harczak's petition to reopen the 1988 claim.

compressed after the 1988 injury and that he had surgically decompressed it in 1989. Notwithstanding that surgery, Dr. Glynn testified that he too had found the right ulnar nerve compressed after the 1997 injury and that surgery had been performed in 1998 to correct the compression. Dr. Glynn explained:

[Harczak had] surgery done ten years ago [by Dr. Madden]. Subsequent to that, we get a little scarring in there [from the surgery]. And then the trauma that occurred in '97 ... causes further swelling and possibly extension of scarring into that area. Then we have a progression of symptoms that led us to the definitive diagnosis [of ulnar nerve compression] and then the surgical correction of that [in 1998].

Dr. Glynn further testified that "Dr. Madden's surgery and the resultant scarring [was] not the prime cause or the significant cause of this situation right now. It was probably the trauma in '97 that contributed to it." In short, the evidence established that the 1997 injury resulted in an organic change in Harczak's condition, namely, a recompression of the ulnar nerve in his right elbow. Accordingly, ALJ Elber did not err in finding that the successive injury doctrine applies, thus subjecting SWG to full liability for the 1997 injury.[3]

### Change of Physicians

■ ¶ 12 But SWG contends it is not liable for the 1998 surgery because Harczak did not request and receive an order from the commission to change physicians, as required by § 23–1070(E). In response, Harczak argues that he requested the change in his letter to ALJ Ireson and that the ALJ's subsequent award granting continuing benefits implicitly approved the requested change. We find this argument unpersuasive for two reasons.

¶ 13 First, as noted above, § 23–1070(E) requires the commission or an ALJ to find a "reasonable ground to believe" that the employee's "health, life or recovery ... is endangered or impaired" by "the medical, surgical or hospital aid or treatment being

furnished by [the] employer." ALJ Ireson's award contains no such finding.

¶ 14 Second, the record demonstrates why ALJ Ireson did not make the requisite finding. After SWG had raised the change-of-physicians issue at the closure hearing, the following exchange took place between ALJ Ireson and Harczak's counsel:

JUDGE IRESON: That issue is not before me now as far as I know at this point.

MR. CLYMER: My hope is if we succeed [in keeping the claim open], there won't be any problem coming up with an appropriate treating doctor.

This exchange shows that ALJ Ireson did not consider the issue part of the closure proceeding and that Harczak's counsel, consistent with his subsequent letter to the ALJ, agreed to defer the issue and any hearing thereon until after ALJ Ireson had decided whether to keep Harczak's claim open.

■ ¶ 15 Harczak further argues, however, that he did not need to request a change of physicians because SWG had closed his claim and stopped furnishing medical care. He acknowledges that the purpose of § 23–1070(E) is to prevent duplicate medical coverage by restricting the employee's right to choose a doctor. As we observed in *Scottsdale Memorial Hospital v. Industrial Commission,* 158 Ariz. 95, 97, 761 P.2d 169, 171 (App.1988): "[E]mployees of [self-insured] employers do not have an unrestricted right to choose their own doctors, because to do so would require the employer to provide double medical coverage—that provided directly and that provided to the employee's own doctor—contrary to the clear statutory scheme for § 23–1070(E) employees." Harczak nonetheless maintains that, because the statute refers to medical care "being furnished" by a self-insured employer, duplicate medical coverage does not occur when a self-insured employer, such as SWG, terminates further medical care and the employee obtains his or her own care. We reject this interpretation of the phrase "being furnished," finding it inconsistent with the statutory scheme governing self-insured employ-

3. Because we have determined that the successive injury doctrine applies, we need not address

Harczak's and the Fund's argument that SWG was precluded from raising the issue.

ers. We believe that statutory scheme calls for a different interpretation.

¶ 16 When statutory language gives rise to differing interpretations, "we will adopt the interpretation that is most harmonious with the statutory scheme and legislative purpose." *State v. Pinto*, 179 Ariz. 593, 596, 880 P.2d 1139, 1142 (App.1994). We thus "construe [statutory] provisions to harmonize rather than contradict one another." *Ban v. Quigley*, 168 Ariz. 196, 198, 812 P.2d 1014, 1016 (App.1990). In sum, we construe the statute " 'together with other related statutes, as though they constituted one law." ' *State ex rel. Romley v. Johnson*, 196 Ariz. 52, ¶ 9, 993 P.2d 453, ¶ 9 (App.1998), *quoting State ex rel. Larson v. Farley*, 106 Ariz. 119, 122, 471 P.2d 731, 734 (1970).

¶ 17 Under § 23–1070(A), an employer other than a governmental entity may, "in lieu of making [insurance] premium payments for medical, surgical and hospital benefits, provide such benefits to injured employees." *See also* A.R.S. § 23–961(A)(1) and (2). In other words, § 23–1070(A) allows an employer "to directly furnish the medical and surgical or hospital benefits required under the workmen's compensation law, rather than paying an insurance premium ... to insure the payment of such benefits." *Arizona Public Service Co. v. Industrial Comm'n*, 27 Ariz.App. 369, 373, 555 P.2d 126, 130 (1976).

¶ 18 But, before the employer may directly furnish those benefits, it must qualify to do so by satisfying certain statutory and administrative requirements. For example, § 23–1070(B) requires an employer who elects to furnish benefits directly to "notify [its] insurance carrier and the commission" and to "render a detailed statement of the arrangements made therefor to the commission." *See also* § 23–961(A)(2) (employer must furnish commission "satisfactory proof of financial ability to pay the compensation directly"). In addition, Rule R20–5–202, Ariz. Admin. Code, requires the employer to file with the commission a detailed self-insurance application, which includes such information as the nature of its business, claims history, and a "[p]rogram to finance medical, surgical, and hospital benefits."

Once filed, the commission may approve or deny the application, Rule R20–5–204, Ariz. Admin. Code, and if approved, the employer must periodically file a renewal application to continue as a self-insured employer. Ariz. Admin. Code R20–5–203. And finally, if the employer fails to comply with the foregoing statutes and regulations, the commission may revoke the employer's self-insurance authority pursuant to § 23–961(A)(2) or R20–5–204. The employer may, of course, voluntarily discontinue being a self-insured employer and thereafter provide workers' compensation benefits through an insurance carrier or the Fund under § 23–961(A)(1).

¶ 19 In light of this statutory scheme, we reject Harczak's interpretation of the phrase "being furnished" as meaning the self-insured employer is no longer furnishing medical benefits to a particular employee. To adopt this interpretation would result in the duplicate coverage that § 23–1070(E) seeks to prevent: the coverage that the self-insured employer would furnish directly to all of its employees and the coverage that it would furnish for an individual employee's independent medical care. Instead, we interpret the phrase to mean that the employer either no longer qualifies as, or has voluntarily discontinued being, a self-insured employer and, thus, medical benefits are no longer "being furnished" directly to its employees, but rather, indirectly through an insurance carrier or the Fund. Given our interpretation, we conclude that § 23–1070(E) applies and that Harczak was required to request a change of physicians. Although he did so in the letter to ALJ Ireson, no hearing has yet been held, findings made, or order entered on the request. Accordingly, ALJ Elber erred in finding the issue moot.

¶ 20 The award is set aside.

ESPINOSA, C.J., and HOWARD, P.J., concur.